**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **TAMMY DULIN, on behalf of herself and all others similarly situated**<br>% DANNLAW<br>15000 Madison Ave.<br>Lakewood, OH 44107<br><br>Plaintiff,<br><br>v.<br><br>**ATHENA BITCOIN, INC.**<br>% Incorp. Services, Inc., Reg. Agent<br>9435 Waterstone Boulevard, Suite 140<br>Cincinnati, Ohio 45249<br><br>Defendant. | Case No.<br><br>Judge<br><br>**CLASS ACTION COMPLAINT WITH JURY DEMAND** |

Plaintiff Tammy Dulin, and for her Class Action Complaint against Defendant Athena Bitcoin, Inc., hereby states as follows:

## INTRODUCTION

1. This class action arises from Defendant Athena Bitcoin, Inc.'s knowing facilitation of, and profiteering from, rampant "impersonation" and tech-support scams conducted through its cash-to-crypto kiosks, and from the company's deliberate failure to employ reasonable, readily available safeguards to prevent predictable victimization—particularly of older adults.

2. Plaintiff Tammy Dulin, a senior resident of Marion County, Ohio, was deceived on June 26, 2025 by a "bank reimbursement/tech support" impersonation scheme. While the scammer remained on the phone giving step-by-step instructions, Ms. Dulin withdrew thousands of dollars in cash and, at the scammer's direction, deposited it into an Athena Bitcoin ATM located at a Shell station at 587 Delaware Avenue, Marion, Ohio (Athena Kiosk No. 17143). Receipts reflect two

same-day cash-to-Bitcoin transactions—approximately $2,600 at 11:58 a.m. and $1,900 at 12:13 p.m.—executed to a QR-coded wallet the scammer controlled. These transactions bore the hallmarks of the very scams Athena admits are the "most common" it sees: first-time, large, rapid deposits by an older adult at a retail kiosk while under real-time, high-pressure phone direction from a criminal impersonator.

3. Athena has had actual knowledge for years that its Bitcoin ATMs are regularly used as the payment rail of choice for impersonation frauds—especially those targeting people 60 and older—because kiosk transactions are immediate, non-custodial, and effectively irreversible once transmitted.[1] Athena has publicly acknowledged receiving "numerous reports of fraud per month" and has described, in chillingly precise terms, the scam playbook: a victim panicked by fabricated legal or financial peril; constant phone supervision by the scammer; withdrawal of large sums of cash; and deposit, one bill at a time, at an identified Bitcoin ATM to a QR code supplied by the perpetrator.

4. Government reports have documented the same trend. In September 2024, the Federal Trade Commission reported that ATM-enabled fraud losses "skyrocketed" between 2020 and 2023, with losses overwhelmingly tied to government, business, and tech-support impersonation schemes, and with older adults disproportionately bearing the losses.[2]

5. In response to these "troubling reports," United States Senators wrote to Athena's CEO on September 11, 2024 demanding immediate action and transparency about basic

---

[1] www.athenabitcoin.com/avoid-these-bitcoin-scams (last visited October 31, 2025)

[2] Federal Trade Commission, Fighting fraud against older adults (Oct. 18, 2023) https://consumer.ftc.gov/consumeralerts/2023/10/fighting-fraud-against-olderadults#:~:text=While%20younger%20people%20were%20still,%241%20billion%20the%20year%20before. (last visited October 21, 2025)

safeguards, including daily and per-transaction limits, holds or reversal windows for suspected fraud, and consumer protections for scam victims. A copy of the Letter is attached as **Exhibit A**.

6. Athena has long had the capability to implement effective controls. In 2017, its own compliance leadership publicly touted a system to "freeze" first-time transactions, contact customers, and reverse suspect transfers—returning tens of thousands of dollars to would-be victims in just weeks.[3] In 2019, Athena also publicized transaction thresholds and enhanced review protocols.[4] Yet in the years since, as impersonation scams surged, Athena retreated to ineffectual "checkbox" warnings and on-screen disclaimers, despite recognizing that victims are not freely choosing to transact but are acting under coercive, real-time directions from criminals. Meanwhile, Athena's business model—immediate cash-to-crypto conversion at a substantial spread—extracts lucrative fees on precisely the high-dollar, first-time, rapid-repeat transactions that are most indicative of fraud. In many instances, Athena also retains a portion of the victim's cash as its fee and then refuses to remediate or refund, even after notice that the transaction was the product of a scam.

7. Athena and its officers set, direct, and maintain these policies and practices. They have chosen speed, volume, and fee revenue over reasonable, readily available safeguards that would materially reduce the predictable, known misuse of their kiosks. They have done so despite repeated internal and external warnings, their own prior demonstrations that meaningful intervention is feasible, and explicit inquiries from federal lawmakers about whether Athena will implement basic protections. The result is a recurring, nationwide pattern whereby organized criminals direct elderly and vulnerable victims to Athena kiosks for large, first-time deposits that

[3] www.youtube.com/watch?v=H4KgClyKsCI. "Operating a Bitcoin ATM Business: Tales from the Front Line," (Fraud Detection discussion at [00:12:19 – 00:14:42]) (March 28, 2017).
[4] www.youtube.com/watch?v=2_hyMd-26I8, at [00:11:20 – 00:11:49] (interview of Gilbert Valentine and Eric Gravengaard, July 2, 2019)

Athena instantaneously approves and transmits to anonymous wallets—foreclosing recovery—while Athena retains its spread.

8. Plaintiff brings this action on behalf of herself and similarly situated class members in Ohio to obtain monetary, injunctive, and equitable relief. Plaintiff asserts claims under state law, including negligence, products liability, civil theft for receiving stolen property, conversion, unjust enrichment, violations of the Ohio Corrupt Practices Act, and civil conspiracy.

9. Plaintiff seeks to recover compensatory and treble damages, restitution and disgorgement of ill-gotten fees, and to obtain forward-looking relief requiring Athena to implement reasonable transaction holds and reversals, tiered limits and velocity controls, enhanced identity and wallet-ownership verification, and other effective safeguards that Athena has acknowledged are both feasible and necessary to protect consumers—particularly older adults—from the predictable, continuing misuse of its kiosks.

## PARTIES

10. Plaintiff Tammy L. Dulin is a natural person who resides in Waldo, Marion County, Ohio. She is over the age of 60. On June 26, 2025, Ms. Dulin was victimized by a bank-reimbursement/tech-support impersonation scam and, at the direction of the scammer who remained on the phone throughout, deposited thousands of dollars in cash into an Athena Bitcoin ATM located at 587 Delaware Avenue, Marion, Ohio (Athena Kiosk No. 17143).

11. Defendant Athena Bitcoin, Inc. is a Delaware corporation. On information and belief, Athena's principal place of business is in Miami, Florida, including offices at 1 SE 3rd Avenue, Miami, Florida 33131. Athena is a money services business registered with the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) and operates a large network of cash-to-crypto kiosks ("Bitcoin ATMs" or "ATMs") throughout the United States

and Latin America, including numerous ATMs in the State of Ohio. Athena placed and operates ATMs in and around Marion County, Ohio, including the kiosk used by Ms. Dulin. At all relevant times, Athena designed, controlled, and implemented the policies, practices, and software governing its ATMs, including transaction limits, holds, identity and wallet verification procedures, on-screen disclosures, and fraud-detection measures.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a putative class action in which the proposed Class consists of at least 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant. Defendant Athena Bitcoin, Inc. is a Delaware corporation with its principal place of business in Miami, Florida, and is therefore a citizen of Delaware and Florida. Plaintiff Tammy Dulin is a citizen of Ohio. Members of the proposed Class are citizens of Ohio, and the Class excludes Defendant and its affiliates. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the federal claims.

13. This Court has personal jurisdiction over Athena Bitcoin, Inc. because it purposefully availed itself of the privilege of conducting business in Ohio by placing, operating, maintaining, and deriving substantial revenue from its network of Bitcoin ATMs throughout Ohio, including the kiosk used by Plaintiff in Marion County, and by directing its policies, practices, and conduct at issue into Ohio. Athena is a registered money services business and has continuously transacted business in this State, including within the Northern District of Ohio.

14. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's transactions at an Athena Bitcoin ATM located at 587 Delaware Avenue, Marion, Ohio, and Athena's operation and control of that kiosk and others in the region. Venue is proper in the Western Division because the events at issue occurred in Marion County, Ohio, and Defendant transacts business in this Division. Intradistrict assignment to the Western Division is therefore appropriate.

15. This Court may award injunctive, declaratory, monetary, and other relief pursuant to its authority under federal and state law, including 28 U.S.C. §§ 2201–2202.

## FACTUAL ALLEGATIONS

### Bitcoin ATMs and How They Operate

16. Bitcoin ATMs are free-standing, internet-connected kiosks that convert physical cash into Bitcoin and transmit it to an online account called a "wallet." The machines resemble traditional ATMs with a touchscreen interface, a bill acceptor, and a camera or scanner to read a wallet's QR code. Unlike conventional bank ATMs, Bitcoin ATMs do not dispense cash when a customer buys Bitcoin; rather, they accept cash and credit the purchased cryptocurrency to the specified wallet address. Most operators—including Athena—design these kiosks to process transactions within minutes, with no practical ability for consumers to cancel or reverse the transfer once initiated or to gain any meaningful understanding of the unilaterally drafted, one sided terms and conditions that Athena claims govern the transactions.

17. A core distinction between Bitcoin ATM transactions and those conducted through major online exchanges is that Bitcoin ATMs are built for immediate, cash-funded, non-custodial transfers. At a kiosk, the user either presents a pre-existing wallet or has the machine generate

one, and the Bitcoin is sent directly to that wallet on the blockchain. The kiosk operator does not control the wallet's private keys and therefore does not hold the purchased cryptocurrency in custody for the user; the transfer is executed to the wallet identified by the QR code scanned at the machine. By contrast, many large online exchanges operate custodial accounts, impose waiting periods for funding and withdrawals, apply layered fraud controls, and can in certain circumstances delay or block suspicious transfers.

18. Operators market Bitcoin ATMs as fast, convenient, and private, but the speed and finality of the transactions come with materially higher costs than online exchanges. The effective price consumers pay at a kiosk is typically the prevailing market price plus a substantial markup or "spread" and fees, which can be significant relative to exchange pricing. The business model thus monetizes instantaneous conversion and settlement at the point of cash deposit and, in practice, generates disproportionately higher revenues on large, urgent transactions. Kiosk interfaces commonly include on-screen warnings and disclaimers about scams and "irreversibility," but these warnings function as passive, user-acknowledgment prompts rather than active transaction-interdiction tools.

19. Athena's network is operated and centrally controlled through its proprietary software, which manages both the consumer-facing kiosk workflow and the back-office functions that monitor, configure, and, when desired, suspend or disable individual machines. The consumer flow typically includes phone-number verification via one-time passcode, identity capture at certain tiers or thresholds, scanning of the destination wallet QR code, and deposit of cash one bill at a time. Once enough information is collected and the cash is accepted, the system prices the Bitcoin at the kiosk rate and initiates delivery to the designated wallet.

20. Athena previously stated it had employed transaction thresholds and additional scrutiny for higher-value purchases and, at times, publicized the capability to freeze or delay first-time transactions for review; however, the company's current standard process is designed to allow rapid, non-custodial transfer immediately upon cash insertion and confirmation at the kiosk.

21. In that scenario, Athena's kiosks operate as Athena designed them: as immediate execution platforms rather than gated review systems. Once the victim inserts cash and confirms the QR-coded destination, Athena's systems approve and transmit the Bitcoin to the scammer's wallet while Athena collects its spread—all without any hold, verification, or intervention mechanism. This design choice, which Athena maintained despite actual knowledge of widespread fraud, foreclosed victims' practical ability to cancel or recover their funds, even when fraud is reported within minutes.

**<u>Athena's Business and Nationwide/Ohio Footprint</u>**

22. Athena Bitcoin, Inc. is a Delaware corporation that operates a large network of cash-to-crypto kiosks ("Bitcoin ATMs" or "ATMs") across the United States and Latin America.

23. Athena is registered as a Money Services Business with the U.S. Department of the Treasury's Financial Crimes Enforcement Network and markets its kiosks as fast, convenient points of sale for buying and selling Bitcoin with cash. Public materials describe a footprint of nearly 3,000 kiosks spanning the U.S., El Salvador, Colombia, Argentina, and Mexico, with substantial coverage in Ohio. As of early 2024, Athena operated approximately 145 ATMs in Ohio, including in Marion County where Plaintiff used Athena Kiosk No. 17143 located at 587 Delaware Avenue, Marion, Ohio.[5]

[5] https://athenabitcoin.com/the-company/ (last visited October. 22, 2025)

24. Athena designs, configures, and centrally controls the end-to-end kiosk workflow and back-office operations through its proprietary software platform (identified in public filings as "Exodus").

25. The consumer-facing workflow typically requires a user to verify a phone number via one-time passcode, present or generate a wallet address by scanning a QR code, and then insert cash one bill at a time; the system immediately prices the transaction at the kiosk rate and initiates delivery of Bitcoin to the specified wallet. The back-office layer provides Athena with continuous remote visibility into machine status and transaction activity, and the ability to monitor, configure, suspend, or disable individual kiosks, and to apply transaction rules (including thresholds and review tiers) across its network.

26. Athena's business model monetizes immediate, non-custodial conversion by charging a substantial markup or "spread" over prevailing exchange prices, in addition to other fees.[6] The company recognizes revenue when the crypto asset is delivered to the destination wallet specified at the kiosk.

27. While Athena has publicly referenced controls in prior years—including daily transaction limits and enhanced scrutiny above specified thresholds—it presently relies primarily on rapid, point-of-sale settlement at retail locations such as gas stations and convenience stores. In practice, this footprint and operating design concentrate high-volume, cash-funded crypto transactions in public, unattended settings across Ohio and the broader U.S., with Athena retaining the fee component of each transaction processed through its network.

**Foreseeable Use of Athena ATMs in Impersonation Scams; Athena's Actual Knowledge**

[6] www.athenabitcoin.com/unlock-financial-freedom-withathena-bitcoin-atms/ (last visited October 22, 2025)

28. Athena has long known—and has repeatedly acknowledged—that its Bitcoin ATMs are regularly used as instrumentalities in "imposter" and tech-support scams, particularly against older adults.

29. As early as 2017, Athena publicly warned of scams at its kiosks, including "Elderly Fraud," "IRS Payment Fraud," and military or government impersonation schemes, and described implementing a system to freeze first-time transactions, contact users directly, and reverse suspect transfers—reporting that within six weeks this intervention returned approximately $30,000 to would-be victims.[7] In 2019, Athena further publicized daily limits (e.g., $9,500) and heightened scrutiny above specified thresholds (e.g., $3,000), reflecting the company's recognition that large, first-time, cash-funded transactions at retail kiosks are strong indicators of fraud.[8]

30. Athena's own website posts reinforce its actual knowledge. In 2022, Athena published "Avoid These Bitcoin Scams," explicitly admitting that "scammers are looking to say and do anything to convince you of an urgent need to pay through Bitcoin" and that they "will often 'helpfully' point out nearby ATMs" and keep victims "on the phone" providing step-by-step instructions.[9] In the same materials, Athena stated that it "receives numerous reports of fraud per month," and identified "Tech Support/Bank Impersonation" as the most common scam it was seeing.[10]

31. In a separate post titled "Fraud Alert: The most common Bitcoin scam we see," Athena graphically described the hallmark features of these crimes—panic, fear of arrest or

---

[7] *supra* note 3.
[8] *supra* note 4.
[9] www.athenabitcoin.com/avoid-these-bitcoin-scams (last visited October 22, 2025)
[10] *Id.*

imminent financial loss, and the scammer's continuous phone supervision—precisely mirroring the schemes suffered by Plaintiff and class members.[11]

32. Government and law enforcement data publicly corroborate the trend Athena has acknowledged internally and externally. In September 2024, the Federal Trade Commission reported that Bitcoin-ATM-enabled fraud losses "skyrocketed" between 2020 and 2023—rising nearly tenfold—with reported losses overwhelmingly tied to government, business, and tech-support impersonation scams.[12] The FTC further found that older adults bear a disproportionate share of losses: people age 60 and older were more than three times as likely as younger adults to report a loss using a Bitcoin ATM, and more than two of every three dollars lost to Bitcoin-ATM fraud were lost by older adults.[13]

33. The FBI likewise warned in a 2021 Public Service Announcement of an increase in scammers directing victims to use physical cryptocurrency ATMs and QR codes, highlighting the same playbook Athena describes: remote-access or support ruses, an urgent need to "secure" funds, a QR code supplied by the scammer, and step-by-step directions to a kiosk while the scammer remains on the phone.[14]

34. Federal lawmakers have specifically pressed Athena to address these dangers. On September 11, 2024, multiple United States Senators called on Athena to "take immediate action to address" reports that Athena's ATMs are contributing to widespread fraud against elderly

---

[11] www.athenabitcoin.com/the-most-common-bitcoin-scam-that-we-see (last visited October 22, 2025)

[12] www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers Federal Trade Commission, September 3, 2024, "FTC Data Spotlight. Bitcoin ATMs: a payment portal for scammers.

[13] *Id.*

[14] https://www.ic3.gov/PSA/2021/PSA211104#:~:text=Internet%20Crime%20Complaint%20Center%20(IC3,malicious%20use%20of%20cryptocurrency%20payments. (last visited October 22, 2025)

Americans. The Senators sought details on whether Athena imposes daily or per-transaction limits, holds or reversal windows for suspected fraud, identity-verification protocols keyed to transaction size or risk, and any insurance or remediation for victims. The inquiry underscored the widely recognized, ongoing misuse of ATMs for impersonation scams and the need for operator-level safeguards Athena has previously said it could deploy. *See* Ex. A.

35. Despite this actual knowledge, Athena's front-line response in recent years has devolved to passive on-screen warnings and checkbox attestations at the kiosk—measures that are predictably ineffective in real-time impersonation scams where the victim is not acting autonomously but under the directed, continuous control of a criminal impersonator.

36. The core product design choices—immediate, non-custodial, cash-to-crypto transfers to QR-coded wallets, executed at unattended retail kiosks, with rapid settlement and no practical reversal—are features Athena knows make its ATMs the payment method of choice for scammers. Athena's own admissions, historical policies demonstrating feasible intervention (first-time transaction freezes, live outreach, limits and enhanced review tiers), and the sustained external scrutiny from the FTC, FBI, and U.S. Senate collectively establish that Athena has long had actual knowledge of the foreseeable, recurrent use of its ATMs in impersonation scams targeting older adults, yet has failed to implement effective, reasonable safeguards commensurate with the known risk.

**<u>Ineffectiveness of Athena's Passive Warnings and Checkboxes</u>**

37. Athena's primary consumer-facing response to the surge of impersonation scams has been to place generic warnings on kiosk screens and require users to acknowledge those warnings by clicking through attestations—such as confirming that they are not being scammed, that the destination wallet belongs to them, and that transactions are irreversible.

38. These prompts are predictably ineffective in the real-world context in which impersonation scams occur. As Athena itself has publicly described, victims are often placed in a heightened state of fear, told that their bank accounts are compromised, threatened with arrest or legal peril, and kept on the phone under continuous direction while they complete the transaction. In that scenario, the victim is not interacting with the kiosk as a voluntary, deliberative customer; they are following step-by-step commands from a criminal posing as a trusted authority. A passive on-screen warning or checkbox cannot interrupt that dynamic.

39. The ineffectiveness of these measures is underscored by the pattern of escalating losses reported by regulators and law enforcement during the very period Athena has relied on such prompts. Reports show that Bitcoin-ATM-enabled fraud losses "skyrocketed" from 2020 through 2023, with older adults disproportionately affected, notwithstanding the presence of on-screen warnings and acknowledgments. This data aligns with Athena's own admissions that it receives numerous reports of fraud per month and that tech support and bank impersonation scams are among the most common it observes. The persistence and growth of such scams, despite Athena's warnings, confirms that checkbox attestations are not an effective safeguard against this form of coercion.

40. Athena's kiosk workflow also compounds the problem. The machines are designed for rapid, cash-funded, non-custodial transfers that finalize shortly after cash insertion and QR code scanning, leaving no practical window to pause, verify, or reverse a suspicious transaction. In practice, the warnings function as a liability shield rather than a risk-interdiction tool: a user—often a first-time, older customer making unusually large or rapid-repeat deposits—must click through disclaimers for the transaction to proceed, even while the scammer remains on the line

instructing them to do exactly that. These acknowledgments neither test true wallet ownership nor interrupt the scammer's control; they merely record the victim's compelled assent.

41. Athena's own history demonstrates that more effective measures are feasible. Years ago, its compliance leadership publicly touted a system to freeze first-time transactions, contact users, and reverse suspect transfers—reporting substantial funds returned to would-be victims over a short period.[15] Athena also publicized transaction thresholds and enhanced review above certain amounts.[16] Those interventions are categorically different from passive prompts: they impose friction where risk is highest, create time for human review, and provide a viable path to stop or undo fraudulent transfers. By contrast, a reasonable operator facing the known risks Athena acknowledged would recognize that warnings and checkboxes impose no meaningful friction, do not enable live verification, and do not create a hold period during which an at-risk transaction can be cancelled.

42. Athena has also used its warnings to deny remediation requests, asserting that transactions are "irreversible." That position is misleading in the context of kiosk design. The cash itself is first deposited into Athena's machine; a portion is retained as Athena's fee or spread; and only the remainder is delivered to the destination wallet. To the extent Athena retains cash as fees or initiates delivery without any hold or review despite strong red flags—such as first-time use by an older customer, unusually large deposits, rapid repeat transactions, and a retail-kiosk setting consistent with impersonation scripts—after-the-fact reliance on user acknowledgments is not a substitute for reasonable safeguards ex ante.

43. In sum, the combination of high-pressure phone coercion, immediate non-custodial settlement, and passive warnings produces a foreseeable and well-documented failure mode:

---

[15] *Supra* note 3.
[16] *Supra* note 4.

victims, especially older adults, click through whatever the kiosk requires as they follow a scammer's instructions in real time. The predictable result—borne out by Athena's admissions and public data—is that warnings and checkboxes do not prevent, interrupt, or reverse these crimes. Effective safeguards require active, risk-based controls such as first-time-user holds with live outreach, tiered limits and velocity checks, wallet-ownership confirmation, and reasonable settlement delays—not passive disclaimers that victims are coached to ignore.

**Feasible, Reasonable Safeguards Athena Could Implement**

44. Athena can materially reduce the predictable misuse of its kiosks by adopting active, risk-based controls that it has already demonstrated are feasible. In 2017, Athena's compliance leadership publicly described a system that froze first-time transactions, conducted live outreach, and reversed suspect transfers—returning approximately $30,000 to would-be victims in a matter of weeks.[17] In 2019, Athena publicized daily transaction limits of $9,500 and heightened scrutiny for transactions exceeding $3,000.[18] These measures establish that effective controls are technically and operationally attainable within Athena's networked platform and back-office software.

45. *First*, Athena should reinstate and mandate first-time user holds combined with live verification before any cash-funded kiosk buy is allowed to settle to a non-custodial wallet. A short hold for initial transactions—especially when initiated at a retail kiosk, involving unusually large amounts, or occurring while a user is rapidly clicking through warnings—creates critical time for human review and consumer protection outreach. Athena has already demonstrated it can freeze first-time transactions and contact customers to screen for scams; the failure to maintain this control as impersonation schemes proliferated is unreasonable.

---

[17] *Supra* note 3.
[18] *Supra* note 4.

46. *Second*, Athena should implement tiered limits and velocity controls calibrated to risk. Reasonable per-transaction caps, rolling daily and weekly limits, and heightened review tiers triggered at modest thresholds are standard fraud-mitigation tools and were previously announced by Athena. New accounts, older adults transacting for the first time, and users attempting large or rapid-repeat deposits at kiosks should face stricter limits by default, with progressive increases only after a verified history of legitimate use.

47. *Third*, Athena should apply enhanced identity verification and destination wallet checks for higher-risk transactions. This includes robust, accurate identity capture keyed to thresholds; additional step-up verification for atypical behavior (e.g., first-time user depositing thousands of dollars at a gas station kiosk); and a destination wallet screening process designed to detect non-ownership or high-risk wallet patterns associated with scams. Where Athena cannot reasonably confirm that the destination wallet is controlled by the purchaser (rather than dictated by a caller), the transaction should be paused pending verification or declined.

48. *Fourth*, Athena should build a reasonable settlement delay for elevated-risk transactions. Instead of immediate, irreversible delivery to the scanned wallet, high-risk flows should queue for additional review, with automated and live outreach to the customer and clear mechanisms to cancel transfers flagged as likely fraud. Athena's back-office platform already enables centralized monitoring and machine-level suspension; leveraging those capabilities to delay settlement is both feasible and prudent.

49. *Fifth*, Athena should adopt kiosk-level intervention protocols and enhanced anti-coercion procedures. For high-risk fact patterns—such as first-time users depositing unusually large amounts, multiple rapid deposits in succession, or transactions undertaken while the user remains on a phone call—kiosks should mandate an active pause and direct contact with Athena

support prior to completion. Static warnings and checkboxes are predictably ineffective; an enforced pause with live support intervention, especially for older users or first-time buyers, can disrupt the scammer's real-time control.

50. *Sixth*, Athena should implement an escalation and remediation framework that prioritizes consumer protection when warning signs are present. This includes: (i) network-wide rules that automatically suspend kiosk activity or require additional review in response to defined red flags; (ii) a documented outreach process with scripts designed to detect coercion and impersonation; (iii) a refund/escrow policy for transactions identified as likely scams while cash remains in Athena's possession or before the crypto is transmitted; and (iv) prompt cooperation with law enforcement and victims once a scam is reported, including returning the operator's fee or spread and any funds still controllable.

51. *Seventh*, Athena should maintain comprehensive data-driven monitoring and reporting. Centralized analytics should track new-user activity, age indicators, transaction size and velocity, time-of-day, kiosk location risk, and complaint data to adapt rule sets dynamically. Athena's proprietary platform already supports network configuration and suspension; extending those functions to enforce risk thresholds and generate real-time interdiction alerts is an incremental, not foundational, step.

52. Collectively, these safeguards are practical, proportionate to the known risks, and consistent with controls Athena has previously touted or partially implemented. The company's existing infrastructure—centralized software management, identity capture at thresholds, kiosk-level configuration, and demonstrated ability to freeze and reverse suspect transfers—makes these measures readily achievable. Choosing not to deploy them, while relying on passive warnings and click-through attestations, elevates speed and fee revenue over consumer safety despite years of

actual knowledge that impersonation scams target older adults and frequently exploit cash-to-crypto kiosks. Plaintiff seeks injunctive relief compelling Athena to adopt these reasonable safeguards and to maintain policies that prevent, rather than passively record, scam-driven transactions.

**Plaintiff-Specific Allegations: Tammy Dulin**

53. Plaintiff Tammy L. Dulin is a senior resident of Waldo, Marion County, Ohio. On June 26, 2025, Ms. Dulin was victimized by a coordinated "tech support/bank reimbursement" impersonation scheme that culminated in two cash-to-Bitcoin deposits at an Athena Bitcoin ATM located inside the Shell station at 587 Delaware Avenue, Marion, Ohio (Athena Kiosk No. 17143). The scam bore the precise hallmarks that Athena has publicly identified as the most common pattern it encounters: a sophisticated impostor induces a victim—typically an older adult—into a state of urgency and fear, maintains continuous phone contact, instructs the victim to withdraw cash from a bank, and directs the victim to deposit the cash into a Bitcoin ATM using a QR code that routes the funds to the scammer's wallet.

54. The scheme began the previous day, June 25, 2025, when Ms. Dulin received a fraudulent PayPal "invoice" for $428.81 allegedly payable to "Coinbase Corporation," with a "customer support" number to call to dispute the charge. When Ms. Dulin called, the person who answered identified himself as "Jack," claimed to be from PayPal, and offered to help close any lingering PayPal accounts and prevent fraudulent charges. He sent Ms. Dulin a purported cancellation form and obtained additional contact with her. The next morning, June 26, 2025, "Jack" called again from 903-358-0994 and claimed the $428.81 would be "reimbursed" as $500 to her bank account but that he needed remote access to complete the transfer. At his direction, Ms. Dulin downloaded and installed a remote-access application (Supremo), provided an ID and

password, and entered her bank information while the scammer maintained control of her computer. Shortly thereafter, the scammer asserted that she had mistakenly "entered an extra zero," that $5,000 had been deposited to her account by "World Bank," and that she needed to promptly "return" the excess funds to set the account straight.

55. Under the scammer's continuous direction by phone, Ms. Dulin drove to her bank, withdrew thousands of dollars in cash, and was instructed not to engage with bank staff beyond completing the withdrawal. The scammer then directed her to the Shell station at 587 Delaware Avenue in Marion, Ohio, which houses an Athena Bitcoin ATM. He remained on the phone providing step-by-step instructions as Ms. Dulin scanned a QR code linked to a wallet the scammer controlled and fed cash into the Athena kiosk. Ms. Dulin printed and retained receipts for two transactions completed minutes apart at the same kiosk on June 26, 2025: a purchase of approximately $2,600 in Bitcoin executed at 11:58 a.m. (Reference ID 395XVYA2) and another purchase of approximately $1,900 in Bitcoin executed at 12:13 p.m. (Reference ID 2DKWYGP3). The receipts list Athena Kiosk No. 17143 at 587 Delaware Avenue, Marion, Ohio, note the applicable Athena pricing and fee components, and provide Athena's support contact information.

56. After returning home, Ms. Dulin reviewed her bank balances and realized the promised "reimbursement" was fictitious and that she had been defrauded. Within days, she reported the crime to authorities, including filing a complaint with the FBI's Internet Crime Complaint Center (IC3) on June 30, 2025, reporting to the Marion County Sheriff's Office (Report No. 2025-01689), and filing with the Federal Trade Commission. She also preserved documentation of the scam communications, the remote-access application details, and phone records indicating that the 903-358-0994 number was a VoIP line registered in Texas.

57. Despite the swift reporting and the clear indicia of fraud, Athena did not remediate Ms. Dulin's losses. On information and belief, Athena retained the fee/spread component of the transactions while allowing the remainder to be transmitted to the scammer's non-custodial wallet, consistent with Athena's standard practice of immediate, irreversible settlement at its kiosks. At the time of Ms. Dulin's transactions, Athena possessed or had real-time access to information that made the activity highly suspicious and consistent with impersonation scams it has repeatedly acknowledged: a first-time older user making unusually large, back-to-back cash deposits at a retail kiosk to a QR-coded wallet; rapid-velocity transactions minutes apart; amounts and patterns inconsistent with Athena's own stated "use cases" for its ATMs; and transaction sizes relative to previously publicized thresholds and limits. Notwithstanding these red flags, Athena's system allowed the transactions to proceed without a hold, verification, or live intervention, and then declined to refund or disgorge the fee revenues retained from the scam-driven transfers.

58. As a direct and proximate result of Athena's conduct and omissions, Ms. Dulin suffered substantial monetary loss and consequential harms. She seeks damages, restitution and disgorgement of the fees Athena retained, and injunctive relief requiring Athena to implement reasonable, active fraud-prevention safeguards that would have prevented or interrupted the scam pattern present in her case.

**Classwide Pattern and Practice**

59. Athena's conduct reflects a uniform, systematic corporate pattern that predictably exposes older adults to impersonation scams and enables large, suspect cash-to-crypto transfers at unattended retail kiosks without meaningful safeguards. Across jurisdictions and over multiple years, the same factual hallmarks recur: a first-time or newly registered user, typically over age 60, is kept on the phone by a criminal impersonator; directed to withdraw large sums of cash from

a bank branch; and instructed to deposit the cash into an Athena kiosk at a gas station or convenience store by scanning a QR code that routes the Bitcoin to a non-custodial wallet controlled by the scammer. Transactions are often unusually large for kiosk use, occur in rapid succession or over a brief window, and far exceed the "small, time-sensitive" use cases Athena itself has described as appropriate for its machines. Despite these conspicuous red flags, Athena's systems authorize immediate, effectively irreversible delivery while retaining substantial fee revenue on the very transactions most indicative of fraud.

60. Public filings, consumer complaints, and law-enforcement data corroborate the scale and consistency of this pattern. Multiple class actions and police reports describe multi-thousand and even five-figure deposits by first-time seniors at Athena kiosks, frequently completed in single transactions or rapid back-to-back deposits while the scammer remains on the phone. Athena's own materials admit receiving numerous reports of fraud each month and identify tech-support, bank, and government impersonation scams as the most common abuses it sees.

61. Federal agencies have documented a surge in ATM-enabled fraud since 2020, with older adults disproportionately targeted and harmed. In September 2024, U.S. Senators formally pressed Athena for basic information about limits, holds, reversals, and consumer protections, reflecting widespread concern that operators' current practices—like Athena's—are inadequate to stem this known misuse.

62. The same operational choices pervade Athena's network. Athena centrally designs and controls kiosk workflows and back-office software, prices cash-to-crypto conversions at a substantial markup or spread recognized as revenue upon delivery, and applies the same passive on-screen warnings and checkbox "attestations" regardless of user risk. These prompts require victims—often acting under real-time coercion—to click through disclaimers stating the wallet is

theirs and the transaction is irreversible, but they do not impose holds, trigger live outreach, or verify true wallet ownership. The passive prompts function as acknowledgments, not interdiction tools, and the continued escalation of ATM-enabled losses during the period these prompts were in place underscores their ineffectiveness.

63. Athena has previously advertised the feasibility of more robust controls—first-time transaction freezes with live customer contact, tiered limits, and enhanced review at modest thresholds—but has not maintained those measures as impersonation scams proliferated. Instead, transactions displaying obvious red flags pass through instantaneously while Athena retains its fee portion, and, in many instances, later denies remediation on the basis of purported "irreversibility." This practice persists even where cash remains within Athena's physical machines at the time of deposit or where the retained fee portion never left Athena retained, and injunctive relief requiring Athena's custody.

64. The result is a classwide, predictable course of conduct with common proofs: centralized policies and software workflows; reliance on passive warnings in lieu of holds, reviews, or live verification; acceptance and immediate settlement of high-risk, first-time, large or rapid-repeat deposits at retail kiosks; and post-notice retention of fee revenues from scam-driven transactions. These uniform practices have caused materially identical harms to older, first-time kiosk users across Ohio and the broader United States, making classwide adjudication appropriate and necessary.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and the following Class:

> All persons over the age of 60 residing in the State of Ohio who were victims of a financial scam involving an Athena ATM

66. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

67. Plaintiff reserves the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

68. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

69. Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy, as the members of the Class (which Plaintiff is informed and believes, and on that basis, alleges that the total number of persons is in the hundreds and can be determined by analysis of Defendant's records) are so numerous that joinder of all members is impractical, if not impossible.

70. Commonality: Plaintiff and Class Members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a. Whether Defendants had a legal duty to Plaintiff and the Class to exercise due care to intervene, prevent, mitigate, and/or deter the use of Athena ATMs in financial scams, arising from common law, actual knowledge, voluntary undertaking, special

relationship, statutory duty under the Bank Secrecy Act and FinCEN regulations, and industry standards.

b. Whether Defendants knew or should have known of the susceptibility of Plaintiff and Class Members to financial scams involving Athena ATMs, particularly older adults.

c. Whether Defendants' security procedures and practices to intervene, prevent, mitigate, and/or deter financial scams involving its Athena ATMs were reasonable in light of the industry standard and feasible alternative designs.

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the intervention, prevention, mitigation, and/or deterrence of financial scams involving its Athena ATMs.

e. Whether Defendants have knowledge that its Athena ATMs are used by criminals to engage in transactions for illegal goods and services, including impersonation and tech-support scams.

f. Whether Defendants negligently designed its Athena ATMs, creating a defective condition unreasonably dangerous to users due to the lack of essential safety features and fraud prevention mechanisms.

g. Whether Defendants failed to design and manufacture its Athena ATMs to prevent the victimization of its users by not incorporating reasonable safeguards such as transaction holds, verification systems, and active intervention mechanisms.

h. Whether Defendants' conduct, including its failure to act and its creation/maintenance of a public nuisance, resulted in or was the direct and proximate cause of Plaintiff's and Class Members' injuries.

i. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages, including punitive damages for reckless, willful, and wanton misconduct, and/or whether injunctive, corrective and/or declaratory relief and/or accounting is/are appropriate as a result of Defendants' wrongful conduct.

j. Whether Plaintiff and Class Members are entitled to restitution and disgorgement of ill-gotten fees as a result of Defendants' wrongful conduct and civil theft for receiving stolen property.

71. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

72. Adequacy of Representation: Plaintiff is an adequate representative of the Class in that the Plaintiff has the same interest in the litigation of this case as the Class Members, is committed to the vigorous prosecution of this case, and has retained competent counsel who are experienced in conducting litigation of this nature.

73. Plaintiff is not subject to any individual defenses unique from those conceivably applicable to other Class Members or the class in its entirety. Plaintiff anticipates no management difficulties in this litigation.

74. Superiority of Class Action: Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member make or may make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

75. The prosecution of separate actions would also create a risk of inconsistent rulings, which might be dispositive of the interests of the Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests adequately.

76. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class in its entirety.

77. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies and practices hinges on Defendant's conduct with respect to the Class in its entirety, not on facts or law applicable only to Plaintiff.

78. Unless a Class-wide injunction is issued, Defendants may continue failing to properly take measures to protect vulnerable persons who fall victim to financial scams involving Defendants' ATMs, and Defendant may continue to act unlawfully as set forth in this Complaint.

79. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## COUNT ONE: NEGLIGENCE
***On behalf of Plaintiff and the Class***

80. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

81. As a money services business registered with the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN), and as an operator of a nationwide network of cash-to-cryptocurrency kiosks, Defendant owed a duty of reasonable care to Plaintiff and Class

Members to implement and maintain adequate safeguards, policies, and procedures to prevent the foreseeable misuse of its Bitcoin ATMs in impersonation and tech-support scams targeting older adults.

82. This duty arises from multiple sources, including but not limited to:

a. Common Law Duty: Defendant's business model created a foreseeable risk of harm from criminal misuse, which Defendant knew was occurring and could prevent;

b. Duty Based on Actual Knowledge: Defendant had years of actual knowledge that its ATMs were regularly used for scams targeting those 60 and older, incurring a duty to protect foreseeable victims;

c. Duty Based on Voluntary Undertaking: By publicly acknowledging the scam problem, describing specific fraud patterns, posting warnings on its website and kiosks, and previously implementing protective measures (including transaction freezes and reversals in 2017 and enhanced review protocols in 2019), Defendant voluntarily assumed a duty to exercise reasonable care;

d. Duty Based on Special Relationship: As the sole entity with the technical capability and operational control to prevent, interrupt, or reverse fraudulent transactions at its kiosks, Defendant had a superior ability and corresponding duty to protect foreseeable victims.;

e. Statutory Duty: As a money services business subject to the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and FinCEN regulations, Defendant owed duties to implement anti-money laundering programs and to know its customers, requiring reasonable steps to detect and prevent transactions with obvious fraud indicators; and

f. Industry Standards: Defendant had a duty to conform its conduct to the standard of care exercised by reasonable operators of similar financial service businesses, including transaction monitoring, risk-based controls, holds for high-risk transactions, and customer verification.

83. Defendant's duty was heightened by its extensive actual knowledge of foreseeable harm. As early as 2017, Defendant's compliance leadership publicly acknowledged ATM misuse in elderly fraud and government impersonation schemes, touting a system that froze first-time transactions, contacted customers, and reversed suspect transfers, returning approximately $30,000 in six weeks. In 2019, Defendant announced daily limits of $9,500 and enhanced scrutiny for transactions over $3,000, recognizing these as strong fraud indicators.

84. In 2022, Defendant's website materials explicitly admitted scammers urge victims to use Bitcoin, direct them to ATMs, and maintain phone contact with step-by-step instructions. Defendant acknowledged "numerous reports of fraud per month," with tech support and bank impersonation being the "most common" scams. A separate post precisely detailed impersonation fraud hallmarks: panic, fear, constant phone supervision, large cash withdrawals, and cash deposits at Bitcoin ATMs via a scammer-supplied QR code.

85. In September 2024, the Federal Trade Commission reported a nearly tenfold increase in Bitcoin-ATM-enabled fraud losses between 2020 and 2023, predominantly from impersonation schemes, with older adults disproportionately affected (over three times more likely to report losses). The FBI also issued warnings about scammers directing victims to cryptocurrency ATMs and QR codes, mirroring Defendant's described scam playbook.

86. On September 11, 2024, United States Senators formally wrote to Defendant's CEO, demanding immediate action and transparency regarding basic safeguards due to reports of ATM contributions to elder fraud.

87. Despite this accumulated knowledge, Defendant abandoned prior protective measures, instead relying on passive on-screen warnings and checkbox attestations, which it knew or should have known were ineffective against real-time coercion by criminal impersonators.

88. Given this knowledge, it was highly foreseeable that first-time users, especially older adults, making large cash deposits at retail kiosks under phone direction from a purported authority figure, were likely scam victims. Rapid, back-to-back transactions at the same kiosk were indicative of scam activity. Passive warnings would not interrupt scams where victims were under continuous, real-time direction and heightened emotional distress. Without active intervention (transaction holds, live customer contact, velocity controls, wallet verification, and meaningful review), scam-driven transactions would continue, causing substantial harm.

89. The applicable standard of care required Defendant to implement and maintain reasonable, readily available safeguards to prevent or substantially reduce known ATM misuse, including:

a. Mandatory holds on first-time, high-risk transactions (e.g., large amounts at retail kiosks), with live outreach to verify identity, understanding, and wallet ownership before settlement.

b. Reasonable per-transaction caps, rolling daily/weekly limits, and heightened review tiers, with stricter limits for new accounts, older adults, and large/rapid-repeat deposits.

c. Robust identity capture keyed to risk, step-up verification for atypical behavior, and destination wallet screening to detect non-ownership or high-risk wallet patterns.

d. Reasonable settlement delays for high-risk transactions, with automated/live customer outreach and clear mechanisms to cancel likely fraudulent transfers.

e. Mandatory active pauses and direct contact with Athena support for high-risk patterns (e.g., first-time users with large deposits, multiple rapid deposits, transactions during phone calls).

f. Network-wide rules to automatically suspend kiosk activity or require review for defined red flags, documented outreach processes to detect coercion, refund/escrow policies for likely scams, and prompt cooperation with law enforcement and victims (including returning fees and controllable funds).

g. Comprehensive data-driven monitoring and reporting (new-user activity, age, transaction size/velocity, time-of-day, kiosk location risk, complaint data) to dynamically adapt rule sets and generate real-time interdiction alerts.

h. Ensuring policies, procedures, and automated systems were designed, implemented, maintained, and updated to address evolving impersonation scams and prioritize consumer protection.

90. These safeguards represent the standard of care for a reasonably prudent operator, as Defendant previously employed many of them, possessed the technical capability, and such measures are standard in the financial services industry and were identified by federal lawmakers. They are proportionate to the known, substantial, and recurring risk of ATM misuse to victimize older adults.

91. Defendant breached its duty of reasonable care by negligently, recklessly, and/or knowingly failing to implement and maintain these reasonable safeguards, despite actual knowledge of the need, technical capability, and prior experience demonstrating feasibility and effectiveness.

92. Specifically, Defendant breached its duty of care in the following respects:

a. Retreating from protective measures (transaction freezes, enhanced review) as scams surged, relying instead on ineffective passive warnings.

b. Failing to implement holds on first-time, high-risk transactions, preventing critical time for review and harm prevention.

c. Failing to conduct live outreach or verification for high-risk transactions.

d. Failing to implement reasonable transaction limits, velocity controls, or tiered review protocols, allowing large, rapid deposits without intervention.

e. Failing to implement effective systems to verify destination wallet control.

f. Designing and operating kiosks to prioritize immediate conversion and fee generation over fraud prevention and consumer protection.

g. Relying on passive warnings and checkbox attestations despite knowing their ineffectiveness against real-time coercion.

h. Approving and processing transactions with multiple, obvious hallmarks of known scam patterns (first-time older users, large cash amounts, rapid back-to-back transactions at retail locations, inconsistent with stated use cases, exceeding review thresholds).

i. Failing to adequately monitor, investigate, and respond to "numerous reports of fraud per month."

j. Failing to adopt reasonable remediation procedures, including refunding fees from scam-driven transactions.

k. Disregarding warnings and inquiries from federal agencies (FTC, FBI) and U.S. Senators.

93. Regarding Plaintiff Tammy Dulin, Defendant breached its duty by approving and processing transactions on June 26, 2025, that displayed numerous red flags: Plaintiff was over 60 (a demographic known to be highly vulnerable), a first-time user, conducted two transactions totaling approximately $4,500 within 15 minutes at the same kiosk, the amounts were large and inconsistent with typical use, occurred at a retail location, and exceeded or approached Defendant's previously announced $3,000 scrutiny threshold.

94. Despite these red flags, Defendant's systems allowed both transactions to proceed immediately without hold, live verification, or meaningful intervention, transmitting Plaintiff's cash to the scammer's wallet while retaining fees.

95. Defendant's breaches of duty directly and proximately caused the harm suffered by Plaintiff and Class Members.

96. But for Defendant's failure to implement reasonable safeguards, scam-driven transactions would have been interrupted, delayed, or prevented, and funds would not have been lost.

97. Defendant's breaches were a substantial factor in causing injuries by providing the means for immediate conversion of cash to irreversible cryptocurrency.

98. Defendant's kiosks were the critical final step, transforming reversible cash into effectively irreversible cryptocurrency, and the immediate, non-custodial nature foreclosed victims' ability to cancel or reverse transfers.

99. Defendant had sole control over transaction approval, delay, or blockage, and sole technical and operational capability to implement preventative safeguards.

100. Reasonable safeguards, previously employed by Defendant and standard in the industry, would have materially reduced victimization and prevented substantial numbers of scam-driven transactions.

101. Defendant's conduct constituted reckless, willful, and wanton misconduct, as it had repeatedly confirmed actual knowledge of ATM misuse to victimize older adults and the substantial harm inflicted. Despite this, Defendant consciously chose to abandon effective safeguards, prioritizing speed, volume, and fee revenue over consumer protection.

102. Defendant disregarded federal agency warnings, FBI alerts, and direct inquiries from U.S. Senators, continuing to approve and profit from transactions with obvious fraud hallmarks.

103. Defendant's business model maximized revenue from known fraud patterns, demonstrating a conscious disregard for the rights and safety of Plaintiff and Class Members and indifference to the substantial and unjustifiable risk created by its policies.

104. As a direct and proximate result of Defendant's negligent, reckless, and willful or wanton breaches, Plaintiff and Class Members suffered substantial damages, including loss of deposited cash, retained fees, economic harm, financial distress, severe emotional distress and anxiety, and other damages.

105. Plaintiff Dulin specifically suffered approximately $4,500 in damages from deposits on June 26, 2025, plus retained fees and emotional distress.

106. Class Members suffered similar damages in amounts to be proven at trial, but in many instances involving losses of thousands or tens of thousands of dollars.

107. Due to Defendant's reckless, willful, and wanton misconduct, Plaintiff and Class Members are entitled to punitive damages to punish and deter similar future conduct.

**COUNT TWO: VIOLATION OF THE OHIO PRODUCTS LIABILITY ACT**
**R.C. 2307.71, *et seq.***
**Negligent Design**
***On Behalf of Plaintiff and the Class***

108. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

109. Defendant is a "manufacturer" as defined by R.C. 2307.71(A)(9), having designed, manufactured, produced, constructed, assembled, installed, and placed into the stream of commerce the Bitcoin ATMs at issue, including their proprietary software systems, user interfaces, transaction workflows, and back-office controls.

110. Athena's ATMs constitute "products" within the meaning of R.C. 2307.71, consisting of integrated hardware and software systems that accept cash from users, capture user information, process and approve transactions through Athena's proprietary Exodus software, scan QR codes to identify destination cryptocurrency wallets, calculate exchange rates and fees, execute immediate delivery of Bitcoin to specified wallets, and communicate transaction data to Athena's centralized servers and third-party blockchain networks.

111. Athena designed and manufactured its ATMs in a defective condition unreasonably dangerous to users because the ATMs lacked essential safety features and fraud prevention mechanisms that were technologically feasible, economically practical, and necessary to prevent foreseeable harm to users, particularly older adults. Athena negligently designed its ATMs by:

a. failing to incorporate transaction holds for first-time users, high-risk transactions, or transactions bearing obvious fraud indicators despite having demonstrated the technical capability to freeze transactions in 2017;

b. failing to incorporate verification systems to confirm wallet ownership, destination wallet legitimacy, or user understanding before executing irreversible transfers;

c. failing to incorporate velocity controls or effective limits on transaction amounts, frequency, or velocity calibrated to user risk profiles despite announcing such controls in 2019;

d. relying on ineffective passive warnings and checkbox attestations rather than active intervention mechanisms despite actual knowledge that such warnings cannot interrupt scams where users act under real-time coercion;

e. designing transaction workflows to prioritize immediate settlement and fee generation over fraud detection, risk assessment, and consumer protection;

f. designing ATMs without mandatory live support contact for high-risk transactions, anti-coercion prompts, or mechanisms to connect users with Athena personnel before executing suspicious transactions;

g. designing back-office software systems that fail to flag, delay, or block transactions bearing multiple red flags consistent with known fraud patterns; and

h. structuring ATMs to execute non-custodial, blockchain-transmitted transfers within minutes of cash insertion without practical ability for users or Athena to cancel, reverse, or delay suspect transactions.

112. At all relevant times, feasible alternative designs existed that would have reduced or prevented foreseeable harm without substantially impairing utility. These alternatives were technologically feasible—Athena's compliance leadership publicly described implementing transaction freezes and reversals in 2017, and Athena's platform already could monitor, configure,

suspend, and control kiosks remotely. They were economically feasible, requiring only software and operational protocol modifications. They would not have impaired legitimate use, as verification holds, limits, and enhanced review would preserve Bitcoin purchases for bona fide customers while reducing exploitation by scammers.

113. Specific feasible alternative designs that Athena failed to implement include:

a. Mandatory holds and live verification for first-time, high-risk transactions.

b. Reasonable per-transaction caps, rolling daily/weekly limits, and heightened review tiers.

c. Robust identity verification and destination wallet checks for higher-risk transactions.

d. Reasonable settlement delays for elevated-risk transactions.

e. Kiosk-level intervention protocols and enhanced anti-coercion procedures.

f. An escalation and remediation framework prioritizing consumer protection.

g. Comprehensive data-driven monitoring and reporting to adapt rule sets dynamically.

114. These omitted design features were available, technologically feasible, and economically practicable at the time the ATMs left Defendant's control, and their inclusion would have materially reduced the foreseeable risks of harm without unduly impairing the ATMs' usefulness or desirability.

115. Athena's design of its ATMs was negligent and created an unreasonably dangerous condition because the risks inherent in the design substantially outweighed the benefits, as the design facilitated widespread victimization of older adults while providing only marginal increases in transaction speed and convenience for legitimate users. The design failed to incorporate safety

features that were standard in comparable financial service products and systems, violated industry norms for fraud prevention and consumer protection in financial services, and the absence of essential fraud prevention mechanisms rendered the ATMs unreasonably dangerous when used in foreseeable ways, including use by first-time older adults who were under real-time direction from criminal impersonators.

116. The defective and unreasonably dangerous design of Athena's ATMs was the direct and proximate cause of injury to Plaintiff and Class Members by enabling scammers to exploit the ATMs to victimize users without meaningful safeguards or ability to cancel or reverse fraudulent transactions.

117. As a direct and proximate result of Athena's negligent design, Plaintiff and Class Members suffered damages including loss of deposited funds, fees retained by Athena, economic harm, and severe emotional distress. Plaintiff Dulin specifically suffered damages when she deposited approximately $4,500 into Athena Kiosk No. 17143 on June 26, 2025, which the defectively designed ATM immediately and irreversibly transmitted to a scammer's wallet while retaining Athena's fees, all without any hold, verification, or meaningful fraud prevention intervention.

**COUNT THREE: VIOLATION OF THE OHIO PRODUCTS LIABILITY ACT**
**R.C. 2307.71, *et seq.***
**Public Nuisance**
***On behalf of Plaintiff and the Class***

118. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

119. Plaintiff and Class Members are "claimants" as that term is defined by R.C. 2307.71(A)(1)(a).

120. Athena is a "supplier" as that term is defined by R.C. 2307.71(A)(13), having designed, manufactured, sold, distributed, leased, installed, and placed into the stream of commerce the Bitcoin ATMs at issue.

121. Defendant created, maintained, and contributed to a public nuisance through its design, operation, and control of Bitcoin ATMs, which foreseeably and repeatedly facilitated impersonation and tech-support scams, particularly against older adults.

122. This nuisance unreasonably interfered with a right common to the general public, specifically the right to be free from widespread financial fraud and exploitation facilitated by commercial enterprises operating within public spaces.

123. The widespread misuse of Athena's ATMs strains public resources including law enforcement agencies investigating fraud, social services supporting victimized seniors, and regulatory bodies attempting to address the ATM-enabled fraud epidemic. The ATMs' role as primary payment rails for fraud schemes interferes with legitimate financial commerce and undermines public confidence in cryptocurrency technology and digital payment systems, while the victimization of older adults through Athena's ATMs causes documented psychological harm, emotional distress, anxiety, and related health consequences that impact public health and community welfare.

124. Athena has prioritized transaction speed, volume, and fee revenue over public safety and fraud prevention, deliberately choosing a business model that facilitates criminal activity. Athena has abandoned fraud prevention measures it previously implemented—including transaction freezes, reversals, and enhanced review—despite knowing that such measures were effective in protecting potential victims.

125. Athena has disregarded warnings from federal agencies and formal inquiries from United States Senators regarding the need to implement safeguards to protect the public, and profits directly from the criminal misuse of its ATMs by retaining substantial fees and spreads from scam-driven transactions, creating a financial incentive to maintain the conditions constituting the nuisance.

126. Defendant's conduct, including its failure to implement reasonable and feasible safeguards despite actual knowledge of the pervasive criminal misuse of its ATMs, was a substantial factor in creating and maintaining this public nuisance.

127. The nuisance caused significant and widespread harm to Plaintiff and Class Members, resulting in substantial monetary losses, economic harm, and emotional distress.

128. The harm caused by the ATMs substantially outweighs any social utility they provide, as the ATMs' primary function has become facilitating fraud rather than enabling legitimate cryptocurrency purchases. The conditions created by Athena are not merely incidental consequences of otherwise lawful activity but rather result from Athena's deliberate design choices and operational policies that prioritize profit over public safety despite actual knowledge of ongoing criminal misuse.

129. Defendant had control over the instrumentalities (its ATMs and associated software) that created the nuisance and had the ability to abate it by implementing effective fraud prevention measures.

130. Plaintiff and Class Members have suffered special injury distinct from that suffered by the public generally in that Plaintiff and Class Members were directly victimized by scammers using Athena's ATMs as designed, manufactured, and operated by Athena, and suffered concrete,

quantifiable financial losses—the actual theft of cash deposited into Athena's ATMs—that are distinct in kind and degree from the generalized harm to public safety and welfare.

131. Plaintiff and Class Members were deprived of specific property rights in their cash and in the fees retained by Athena from the fraudulent transactions, and suffered particularized emotional distress, mental anguish, and psychological harm directly resulting from their individual victimization through Athena's ATMs.

132. These special injuries are of a different kind than the general public's interest in safety and security, constituting direct economic loss and personal harm rather than a mere stake in the public's common rights.

133. As a direct and proximate result of Athena's creation and maintenance of a public nuisance, Plaintiff and Class Members suffered damages including loss of cash deposited into Athena ATMs, fees and charges retained by Athena from fraudulent transactions, economic harm and financial distress, severe emotional distress and mental anguish, and such other damages as may be proven at trial.

134. Plaintiff and Class Members are entitled to injunctive relief compelling Defendant to abate the nuisance by implementing reasonable, active fraud prevention safeguards, as well as compensatory damages, costs, and attorney fees.

## COUNT FOUR: CIVIL THEFT FOR RECEIVING STOLEN PROPERTY
**R.C. 2913.51(A)**
***On behalf of Plaintiff and the Class***

135. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

136. R.C. 2307.61 permits property owners to bring civil actions under R.C. 2307.60 to recover damages from any person who commits a theft offense, as defined in R.C. 2913.01. A "theft offense" includes receiving stolen property in violation of R.C. 2913.51, which prohibits

receiving, retaining, or disposing of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.

137. Plaintiff and Class Members were the rightful owners of the cash they possessed and withdrew from their bank accounts for deposit into Athena's ATMs. Those funds were stolen from Plaintiff and Class Members through theft by deception in violation of R.C. 2913.02(A)(3), committed when third-party scammers, by deception, knowingly caused Plaintiff and Class Members to deliver and deposit their cash into Athena's ATMs with purpose to deprive Plaintiff and Class Members of their property.

138. Athena received, retained, and disposed of Plaintiff's and Class Members' stolen property in multiple respects:

a. Athena received and took physical possession of cash inserted into its ATMs, which cash had been obtained by scammers through theft by deception;

b. from that stolen cash, Athena retained substantial portions as fees, spreads, and markups—typically 10% to 25% or more of transaction amounts;

c. Athena disposed of the stolen property by converting cash into Bitcoin and transmitting it to wallet addresses controlled by scammers, thereby completing the theft and making the property effectively irretrievable; and

d. Athena continues to retain the fees and charges it extracted from stolen property, refusing to return such funds even after being notified that the transactions were products of theft offenses.

139. By way of example, from Plaintiff Dulin's approximately $4,500 in cash deposited on June 26, 2025—which cash was obtained by scammers through theft by deception—Athena received the entire amount, retained a substantial portion as fees and spread, and disposed of the

remainder by converting it to Bitcoin and transmitting it to a scammer-controlled wallet. Athena similarly received cash from all Class Members that had been obtained through theft offenses, retained portions as compensation to itself, and disposed of the remainder in a manner that placed the property beyond recovery by the rightful owners.

140. Athena received, retained, and disposed of Plaintiff's and Class Members' property knowing, or having reasonable cause to believe, that the property had been obtained through commission of theft offenses. Athena has actual knowledge, repeatedly acknowledged since at least 2017, that its ATMs are regularly and systematically used as instrumentalities in theft by deception schemes targeting older adults. Athena publicly admitted receiving "numerous reports of fraud per month," identified impersonation scams as the "most common" criminal activity occurring through its ATMs, and publicly described in precise detail the methodology of the theft schemes—victims panicked by false pretenses, kept on the phone by scammers, directed to withdraw cash, and instructed to deposit cash into Bitcoin ATMs using QR codes provided by criminals.

141. Athena's systems collected information about each transaction that provided reasonable cause to believe the property was stolen, including: first-time or infrequent users indicating unfamiliarity with cryptocurrency; older adult users from the demographic Athena knew was disproportionately targeted (more than three times as likely to lose money through Bitcoin ATM fraud according to federal agencies); large cash amounts inconsistent with typical Bitcoin ATM use; rapid successive transactions at the same kiosk; transactions at retail locations where victims are commonly directed; and amounts and patterns matching the "most common" theft scenarios Athena had publicly described. In numerous instances, including Plaintiff Dulin's case, Athena received explicit notice shortly after transactions that the property had been obtained

through theft offenses, as victims reported the crimes to Athena, yet Athena refused to return the fees and portions of stolen property it had retained.

142. Defendant's knowledge or reasonable cause to believe the property was stolen is further evidenced by:

a. Athena's abandonment of fraud detection measures it previously employed despite knowing such measures were effective in identifying stolen property;

b. Athena's conscious decision to rely on passive warnings rather than active verification knowing that passive warnings could not prevent receipt of stolen property when victims acted under scammer direction;

c. Athena's refusal to implement readily available safeguards that would have enabled Athena to determine whether property was stolen before receiving or retaining it;

d. the recurring, systematic nature of theft schemes using Athena's ATMs—occurring across thousands of kiosks over many years—which put Athena on notice that any transaction bearing the identified hallmarks was likely the product of a theft offense; and

e. Athena's retention of fees from transactions it was notified were products of theft, demonstrating knowledge of the stolen nature of the property and intent to permanently deprive the rightful owners.

7. Defendant's actions constitute civil theft under R.C. 2307.61.

143. Athena's conduct was willful within the meaning of R.C. 2307.60 in that Athena acted with knowledge or reasonable cause to believe the property was stolen, deliberately failed to take reasonable steps to determine the property's status before receiving it, consciously chose to

retain portions of property it knew or had reason to believe was stolen, and refused to return retained property even after receiving explicit notice of theft.

144. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered damages, including the loss of their deposited cash and fees retained by Defendant.

145. Plaintiff and Class Members are entitled to recover treble damages, costs, and reasonable attorney fees as provided by R.C. 2307.61.

## COUNT FIVE: CONVERSION
***On behalf of Plaintiff and the Class***

146. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

147. Plaintiff and Class Members had ownership of and superior possessory rights in the cash they deposited into Athena's ATMs. Plaintiff and Class Members also retained superior rights to the fees, spreads, and markups that Athena extracted from their deposits, as the underlying transactions were products of criminal fraud and lacked genuine consent necessary for valid transfer of ownership. Plaintiff and Class Members did not voluntarily relinquish their property rights; rather, they were deceived by scammers into depositing funds under false pretenses while Athena knowingly facilitated these fraudulent transfers.

148. Defendant wrongfully exercised unauthorized dominion and control over Plaintiff's and Class Members' property by:

a. receiving and processing transactions bearing obvious fraud indicators without holds, verification, or intervention;

b. extracting and retaining substantial fees from deposits Athena knew or had reasonable cause to believe were scam-driven;

c. converting cash into Bitcoin and transmitting it to wallet addresses Athena knew or had reasonable cause to believe were controlled by criminals, not by Plaintiff or Class Members;

d. structuring transactions as immediate and effectively irreversible, thereby permanently depriving Plaintiff and Class Members of their property; and

e. upon receiving notice of fraud, refusing to return fees and property portions Athena had retained.

149. Defendant's conversion was intentional, knowing, or reckless. Athena had actual knowledge since at least 2017 that its ATMs were regularly used in fraud schemes targeting older adults and admitted receiving "numerous reports of fraud per month." Athena knew that transactions bearing specific hallmarks—first-time older users, large amounts, rapid succession, retail locations—were likely fraudulent, yet deliberately chose not to implement available safeguards. Athena structured its business model to prioritize fee revenue over verification of transaction legitimacy, knowing this would result in regular conversion of fraud victims' property. After receiving notice that specific transactions were fraudulent, Athena intentionally refused to return retained property, asserting ownership over funds it knew were obtained through fraud it facilitated.

150. Plaintiff and Class Members demanded return of their property. Plaintiff Dulin reported the fraud to the FBI's Internet Crime Complaint Center (June 30, 2025), the Marion County Sheriff's Office (Report No. 2025-01689), the Federal Trade Commission, and contacted or attempted to contact Athena. Class Members similarly reported fraudulent transactions and demanded return of their property. Despite these demands, Athena refused to return or refund the

fees and spreads it retained, refused to take reasonable steps to reverse or intercept transmitted Bitcoin, and refused to provide restitution or disgorge profits obtained from facilitating fraud.

151. Plaintiff and Class Members have superior rights to the converted property. The transactions were not genuine, voluntary transfers but were induced by criminal fraud that Athena knowingly or recklessly facilitated. As between an innocent property owner and a party who facilitated the wrongful taking through knowing or reckless conduct, the law favors the innocent owner. Athena lacked lawful authority to transmit Plaintiff's and Class Members' property to criminal-controlled wallets when Athena knew such transactions were foreseeable products of fraud schemes regularly perpetrated through its ATMs, to retain fees extracted from fraudulent transactions, or to refuse remediation after receiving notice of fraud.

152. As a direct and proximate result of Athena's conversion, Plaintiff and Class Members have suffered damages including: the loss of cash deposited into Athena's ATMs; the loss of fees and spreads that Athena wrongfully retained; loss of use and enjoyment of their property; economic harm and financial distress; and severe emotional distress and mental anguish. Plaintiff Dulin specifically suffered damages in the amount of approximately $4,500 deposited into Athena Kiosk No. 17143 on June 26, 2025, together with the fees and spread retained by Athena from those transactions.

153. Defendant’s conversion was willful, wanton, and malicious. Athena had actual knowledge that its conduct facilitated systematic conversion of fraud victims' property, deliberately chose to prioritize fee revenue over property rights and consumer protection, abandoned fraud prevention measures it knew were effective, and after receiving notice of fraud intentionally refused to return converted property. Athena's conduct was motivated by financial

gain and demonstrated conscious indifference to the substantial likelihood of harm to Plaintiff and Class Members' property rights.

154. By reason of Athena's willful, wanton, and malicious conversion, Plaintiff and Class Members are entitled to an award of punitive damages in an amount sufficient to punish Athena and to deter Athena and others from similar conduct in the future.

**COUNT SIX: UNJUST ENRICHMENT**
***On behalf of Plaintiff and the Class***

155. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

156. Plaintiff brings this claim in the alternative to any contract-based claims and alleges that no valid, enforceable contract exists between Plaintiff and Class Members and Athena regarding the transactions at issue, or that if any such agreement exists, it is void, voidable, or unenforceable due to fraud, unconscionability, lack of genuine assent, and violation of public policy.

157. Plaintiff and Class Members conferred substantial monetary benefits upon Athena by depositing cash into Athena's ATMs from which Athena extracted and retained substantial fees, spreads, and markups typically ranging from 10% to 25% or more of each transaction amount. Plaintiff Dulin alone conferred approximately $4,500 in cash deposits on June 26, 2025, from which Athena extracted and retained fees likely exceeding $450 to $1,125 based on Athena's typical fee structure. Class Members collectively conferred millions of dollars in cash deposits and hundreds of thousands of dollars in fees upon Athena through scam-driven transactions over the course of years.

158. These benefits were conferred at Plaintiff's and Class Members' expense, who lost their cash deposits and received no legitimate value, service, or consideration in return. The

benefits were conferred without Plaintiff's and Class Members' genuine, informed, voluntary consent, as they acted under fraud and deception perpetrated by third-party scammers and were misled about the nature and consequences of the transactions.

159. Athena had actual knowledge of the substantial benefits conferred upon it, as Athena's ATMs collected and recorded all transaction data including amounts, dates, times, and user information, and Athena's software calculated and retained all fees, spreads, and markups from each transaction. Athena also had specific knowledge that these benefits came from fraudulent transactions, as Athena received "numerous reports of fraud per month," identified impersonation scams as the "most common" activity at its ATMs, and received direct notice from Plaintiff and Class Members that their specific transactions were products of fraud.

160. Athena's retention of these benefits is unjust and inequitable because Athena obtained them through its knowing or reckless facilitation of fraud schemes targeting vulnerable older adults. Athena had actual knowledge that its ATMs were regularly used as instrumentalities of impersonation scams yet deliberately failed to implement reasonable safeguards to prevent such misuse, despite having previously demonstrated the technical capability and effectiveness of transaction freezes, reversals, and enhanced review protocols.

161. Athena knew or had reasonable cause to believe that the transactions were fraudulent at the time they occurred, based on obvious red flags including first-time older users, large cash amounts inconsistent with legitimate Bitcoin ATM use, rapid successive transactions, retail kiosk locations, and transaction patterns matching the "most common" fraud scenarios Athena had publicly described. Despite this knowledge, Athena structured its operations to prioritize fee revenue over consumer protection and processed transactions bearing multiple fraud indicators without meaningful intervention.

162. Upon receiving actual notice that specific transactions were products of fraud—including explicit reports from Plaintiff Dulin and other Class Members to Athena, law enforcement, and federal agencies—Athena refused to return the fees and portions of deposits it had retained, despite having no legitimate claim to property obtained through facilitation of fraud. Athena provided no legitimate service or value to Plaintiff and Class Members in exchange for the benefits received, as the transactions were not genuine customer-initiated Bitcoin purchases but rather were scam-driven transfers of stolen funds to criminal wallets.

163. It would be unconscionable and against equity and good conscience to permit Athena to retain fees extracted from fraudulent transactions that Athena knew or should have known were fraudulent at the time they occurred, that Athena had the capability to prevent but chose not to prevent, and that resulted in Athena profiting while victims lost their savings.

164. Athena's conduct was unconscionable in that Athena exploited the vulnerability of older adults targeted by scammers, profited directly from criminal activity it knew was occurring through its ATMs, disregarded warnings from federal agencies and United States Senators, and refused to implement readily available safeguards or disgorge profits even after receiving notice of fraud.

165. Athena's retention of benefits obtained through facilitation of elder fraud violates strong public policies protecting vulnerable adults from financial exploitation and requiring financial services businesses to implement reasonable fraud prevention measures. As the sole entity with technical capability and operational control to prevent, interrupt, or reverse fraudulent transactions, Athena occupied a position of superior knowledge and ability relative to victims yet failed to fulfill corresponding obligations, making its retention of benefits fundamentally inequitable.

166. Plaintiff and Class Members have no adequate remedy at law because any purported contractual agreement is void, voidable, or unenforceable due to fraud, lack of genuine assent, unconscionability, and violation of public policy. The purported "terms of service" were not meaningfully disclosed, explained, or negotiated, and cannot legitimize Athena's retention of benefits obtained through facilitation of fraud. Legal remedies are inadequate to address the inequity of Athena's enrichment at the expense of defrauded older adults, and equitable relief in the form of restitution and disgorgement is necessary to prevent unjust enrichment.

167. Equity and good conscience require that Athena disgorge and return to Plaintiff and Class Members all fees, spreads, markups, and charges that Athena extracted and unjustly retained from fraudulent transactions, together with any other portions of cash deposits that Athena received and retained and the value of benefits that Athena obtained through transaction volume and revenue generated from facilitation of fraud.

168. As a direct result of Athena's unjust enrichment, Plaintiff and Class Members have been damaged in amounts equal to the benefits unjustly obtained and retained by Athena.

169. Plaintiff Dulin specifically seeks restitution of the fees, spreads, and markups that Athena extracted and retained from her approximately $4,500 in cash deposits on June 26, 2025, which amount exceeded $450 and may have exceeded $1,125 based on Athena's typical fee structure.

170. Class Members seek similar restitution of fees, spreads, and markups that Athena unjustly obtained and retained from their cash deposits in fraudulent transactions.

## COUNT SEVEN: VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT - UNCONSCIONABLE CONDUCT

**R.C. 1345.01, *et seq.***

***On behalf of Plaintiff and the Class***

171. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

172. The Ohio Consumer Sales Practices Act, R.C. Chapter 1345, prohibits suppliers from committing unconscionable acts or practices in connection with consumer transactions.

173. Athena is a "supplier" within the meaning of R.C. 1345.01(C) because Athena sells services—specifically, cash-to-cryptocurrency conversion services—to consumers in the regular course of business.

174. Plaintiff and Class Members are "consumers" within the meaning of R.C. 1345.01(D) because they engaged in consumer transactions with Athena for personal, family, or household purposes.

175. The transactions at issue—wherein Plaintiff and Class Members deposited cash into Athena's Bitcoin ATMs to purchase Bitcoin—constitute "consumer transactions" within the meaning of R.C. 1345.01(A) because they involved a sale of services by a supplier to a consumer.

176. Athena committed unconscionable acts and practices in connection with these consumer transactions, in violation of R.C. 1345.03(A).

177. First, Athena knowingly took advantage of consumers' inability to reasonably protect their interests because of their vulnerabilities, in violation of R.C. 1345.03(B)(1).

178. Athena had actual knowledge that its Bitcoin ATMs were regularly used to victimize older adults age 60 and over, a demographic Athena knew was more than three times as likely as younger adults to fall victim to Bitcoin ATM scams.

179. Athena knew that victims targeted in impersonation and tech-support scams were placed in heightened states of fear, panic, and confusion by scammers who fabricated urgent legal

or financial peril, threatened arrest or account seizure, and maintained continuous phone control over victims during transactions.

180. Athena knew that victims acting under such coercion and psychological manipulation had a diminished ability to reasonably protect their interests and make voluntary, informed decisions about the transactions.

181. Athena knew that first-time users of Bitcoin ATMs, particularly older adults, had limited understanding of cryptocurrency technology, the irreversibility of blockchain transactions, and the risks of non-custodial transfers to unknown wallet addresses.

182. Despite this actual knowledge, Athena structured and maintained its Bitcoin ATM operations to process transactions from such vulnerable consumers without meaningful safeguards, live verification, or intervention designed to protect consumers acting under coercion or with impaired decision-making capacity.

183. Athena knowingly took advantage of these vulnerabilities by designing systems that enabled scammers to maintain continuous control over victims during transactions, requiring only that victims click through passive warnings that scammers coached them to bypass, and approving large, first-time transactions from older adults displaying obvious indicators of fraud without any hold, human contact, or verification of the victim's true understanding and intent.

184. Second, Athena knew at the time consumer transactions were entered into that consumers would be unable to receive any substantial benefit from the transactions, in violation of R.C. 1345.03(B)(3).

185. At the time Plaintiff and Class Members deposited cash into Athena's Bitcoin ATMs and executed transactions, Athena knew or had reasonable cause to believe—based on multiple red flags including first-time older users, unusually large amounts, rapid successive

transactions, retail kiosk locations, and transaction patterns matching the "most common" fraud scenarios Athena had publicly described—that the transactions were products of scams and that consumers were not acting voluntarily to purchase Bitcoin for their own benefit.

186. Athena knew that in such scam-driven transactions, consumers would receive no benefit whatsoever from the transaction—no Bitcoin in a wallet they controlled, no legitimate service, no value—and would instead lose their entire cash deposit except for the portion Athena retained as fees.

187. Athena knew that the Bitcoin purchased was being transmitted immediately and irreversibly to wallet addresses controlled by scammers, not by the consumers who deposited the cash.

188. Despite this knowledge that consumers could not and would not receive any substantial benefit from the transactions, Athena processed the transactions, extracted and retained substantial fees, and transmitted consumers' funds to scammer-controlled wallets.

189. Third, Athena required consumers to enter into transactions on terms Athena knew were substantially one-sided in favor of Athena, in violation of R.C. 1345.03(B)(5).

190. Athena structured its Bitcoin ATM transactions to be immediate, non-custodial, and effectively irreversible, with no practical ability for consumers to cancel or reverse transactions once initiated, even when fraud was discovered and reported within minutes.

191. Athena's terms required consumers to accept all risk of loss, including loss due to fraud that Athena knew was widespread and that Athena had the capability to prevent or substantially reduce through readily available safeguards.

192. Athena's terms allowed Athena to extract and retain substantial fees—often 10% to 25% or more of transaction amounts—from every transaction, including transactions Athena knew

or had reasonable cause to believe were fraudulent, while providing consumers with no recourse, no refund mechanism, and no remediation even when fraud was promptly reported.

193. Athena's terms imposed no corresponding obligations on Athena to verify transaction legitimacy, confirm wallet ownership, implement fraud prevention measures, hold or delay suspicious transactions for review, or provide any consumer protection despite Athena's actual knowledge of widespread scam activity through its ATMs.

194. These terms were substantially one-sided in Athena's favor because Athena profited regardless of whether transactions were legitimate or fraudulent, retained fees even from scam-driven transactions, bore no risk of loss, and owed no duties to protect consumers despite superior knowledge and sole technical capability to prevent victimization.

195. Fourth, Athena has, without justification, refused to make refunds to consumers who purchased with cash, in violation of R.C. 1345.03(B)(7).

196. After Plaintiff and Class Members reported that their transactions were products of fraud, Athena refused to refund or return the fees and portions of cash deposits that Athena had extracted and retained from the fraudulent transactions.

197. Athena had no justification for refusing to refund fees obtained from transactions Athena knew or should have known were fraudulent at the time they occurred, and that Athena had actual notice were fraudulent shortly after they occurred.

198. Athena retained fees extracted from stolen property—cash that had been obtained from Plaintiff and Class Members through theft by deception—and refused to disgorge such fees even after receiving explicit notice that the transactions were products of criminal fraud.

199. Athena's refusal to refund is particularly unconscionable given that Athena: (i) had actual knowledge its ATMs were regularly used for scams; (ii) had the technical capability to

prevent or interrupt the fraudulent transactions but chose not to implement safeguards; (iii) profited directly from facilitating the scams by retaining fees; and (iv) received prompt notice from victims that the transactions were fraudulent.

200. Athena's unconscionable acts and practices were committed in connection with consumer transactions within the meaning of R.C. 1345.03(A), as they occurred before, during, and after the transactions.

201. Before the transactions, Athena's unconscionable conduct included designing and maintaining ATM systems that lacked reasonable fraud prevention safeguards despite actual knowledge that such systems would be exploited to victimize vulnerable older adults; abandoning effective fraud detection measures Athena had previously implemented; and establishing transaction terms that were substantially one-sided in Athena's favor while exposing vulnerable consumers to foreseeable, preventable harm.

202. During the transactions, Athena's unconscionable conduct included knowingly processing transactions from vulnerable older adults displaying obvious indicators of fraud without holds, verification, or intervention; taking advantage of consumers' impaired ability to protect their interests due to scammer coercion; extracting and retaining substantial fees from transactions Athena knew or had reasonable cause to believe were fraudulent; and approving immediate, irreversible transmission of consumers' funds to scammer-controlled wallets despite red flags indicating the transactions were not in the consumers' interests.

203. After the transactions, Athena's unconscionable conduct included refusing to refund fees extracted from fraudulent transactions even after receiving notice of fraud; declining to implement safeguards to prevent future victimization despite repeated warnings from federal

agencies and lawmakers; and continuing to profit from a business model Athena knew facilitated the systematic exploitation of vulnerable older adults.

204. Athena's unconscionable acts and practices were committed knowingly and willfully. Athena had actual knowledge since at least 2017 that its Bitcoin ATMs were regularly used to victimize older adults in impersonation scams. Athena publicly acknowledged receiving "numerous reports of fraud per month" and identified impersonation scams as the "most common" activity at its ATMs. Despite this knowledge, Athena deliberately chose to maintain systems and practices that enabled such victimization, abandoned safeguards it had previously implemented, disregarded warnings from the FTC, FBI, and United States Senators, and prioritized transaction speed and fee revenue over consumer protection.

205. As a direct and proximate result of Athena's unconscionable acts and practices, Plaintiff and Class Members have suffered ascertainable losses including the loss of cash deposited into Athena's Bitcoin ATMs, the loss of fees and charges extracted and retained by Athena from fraudulent transactions, economic harm, financial distress, and severe emotional distress.

206. Plaintiff Dulin specifically suffered ascertainable losses in the amount of approximately $4,500 deposited into Athena Kiosk No. 17143 on June 26, 2025, together with the fees extracted and retained by Athena from those transactions. Class Members suffered similar ascertainable losses in amounts to be proven at trial.

207. Pursuant to R.C. 1345.09, because Athena committed the unconscionable acts and practices knowingly and willfully, Plaintiff and Class Members are entitled to recover three times their actual damages or $200, whichever is greater, an award of reasonable attorney's fees, and declaratory and injunctive relief, including an order requiring Athena to implement reasonable fraud prevention safeguards and to cease unconscionable practices.

**COUNT EIGHT: VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT - UNFAIR CONDUCT**
**R.C. 1345.01, *et seq.***
***On behalf of Plaintiff and the Class***

208. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

209. Under R.C. 1345.02(C), this Court shall give due consideration and great weight to Federal Trade Commission interpretations of unfair practices. The Federal Trade Commission defines practices as "unfair" when they: (1) cause substantial injury to consumers; (2) that consumers cannot reasonably avoid; and (3) that are not outweighed by countervailing benefits to consumers or competition.

210. Athena's acts and practices satisfy all three elements of unfairness:

a. Substantial Injury: Athena's practices caused substantial injury to Plaintiff and Class Members, who lost thousands to tens of thousands of dollars in cash deposited into Athena's ATMs and transmitted to scammer-controlled wallets. Federal Trade Commission data documents that Bitcoin-ATM-enabled fraud losses skyrocketed between 2020 and 2023, with losses overwhelmingly concentrated among older adults. The injury is substantial both to individual victims and in the aggregate.

b. Cannot Reasonably Avoid: Consumers cannot reasonably avoid injury from Athena's practices because:

   i. Victims were acting under real-time coercion and psychological manipulation by criminal impersonators who induced panic, maintained continuous phone control, and directed victims' actions;

ii. Victims, particularly older adults, lacked the specialized knowledge necessary to understand cryptocurrency technology, blockchain irreversibility, and the risks of non-custodial transfers;

iii. Once victims inserted cash and confirmed transactions at Athena's kiosks, they had no practical ability to cancel or reverse the transfers;

iv. Athena's passive warnings were predictably ineffective against coercion and could not enable victims to protect themselves;

v. Athena possessed superior knowledge of fraud patterns and sole technical capability to prevent harm, while victims had no means to protect their own interests without Athena's intervention.

c. Not Outweighed by Benefits: The injuries caused by Athena's practices are not outweighed by any countervailing benefits to consumers or competition because:

i. There is no consumer benefit to systems that enable elder fraud and financial exploitation;

ii. There is no competitive benefit to business models that profit from facilitating criminal activity;

iii. Athena's claimed benefits of speed and convenience for legitimate Bitcoin purchases are minimal compared to the massive harm inflicted on fraud victims;

iv. Readily available alternative designs—including transaction holds, verification, limits, and active intervention—would preserve legitimate uses while substantially reducing fraud;

v. The social costs of Athena's practices, including law enforcement resources, victim support services, and destruction of older adults' financial security, far exceed any efficiencies gained from Athena's rapid, unverified transaction processing.

211. Athena's unfair practices include, but are not limited to: designing and maintaining Bitcoin ATM systems that lack reasonable fraud prevention safeguards despite actual knowledge of widespread elder victimization; processing high-risk transactions bearing obvious fraud indicators without holds, verification, or intervention; extracting and retaining substantial fees from transactions Athena knew or had reasonable cause to believe were fraudulent; enabling immediate, irreversible transmission of victims' funds to scammer-controlled wallets; and refusing to implement readily available safeguards or provide remediation even after receiving notice of fraud.

212. As a direct and proximate result of Athena's unfair practices, Plaintiff and Class Members suffered ascertainable losses including the loss of cash deposited into Athena's Bitcoin ATMs, the loss of fees and charges extracted and retained by Athena from fraudulent transactions, economic harm, financial distress, and severe emotional distress.

213. Plaintiff Dulin specifically suffered ascertainable losses in the amount of approximately $4,500 deposited into Athena Kiosk No. 17143 on June 26, 2025, together with the fees extracted and retained by Athena from those transactions. Class Members suffered similar ascertainable losses in amounts to be proven at trial.

214. Pursuant to R.C. 1345.09, Plaintiff and Class Members are entitled to recover three times their actual damages or $200, whichever is greater, an award of reasonable attorney's fees,

and declaratory and injunctive relief, including an order requiring Athena to implement reasonable fraud prevention safeguards and to cease unconscionable practices.

## COUNT NINE: CIVIL CONSPIRACY
***On behalf of Plaintiff and the Class***

215. Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

216. At all relevant times, Defendant Athena Bitcoin, Inc. and unknown criminal fraudsters who perpetrated impersonation and tech-support scams against Plaintiff and Class Members (collectively, the "Conspirators") formed a malicious combination to injure Plaintiff and Class Members in their property.

217. The Conspirators acted with the intent to commit wrongful acts purposely, without reasonable or lawful excuse, to the injury of Plaintiff and Class Members. The criminal fraudsters acted to steal from vulnerable victims through deception. Athena acted with actual knowledge—repeatedly confirmed over years—that its Bitcoin ATMs were regularly used as instrumentalities of fraud targeting vulnerable older adults, yet purposely maintained operational systems that approved and processed high-risk transactions bearing obvious hallmarks of fraud without implementing readily available safeguards.

218. The Conspirators came to a mutual understanding to accomplish this wrongful purpose through their coordinated conduct and interdependent actions. An express agreement was not necessary. The mutual understanding is evidenced by:

a. The criminal fraudsters systematically directed victims specifically to Athena Bitcoin ATMs, demonstrating knowledge that Athena's kiosks would reliably process large, suspicious transactions without intervention;

b. Athena maintained operational systems designed to approve immediate, non-custodial, effectively irreversible transactions despite actual knowledge that such systems were the payment rail of choice for impersonation frauds;

c. The symbiotic relationship whereby fraudsters relied on Athena to provide critical infrastructure for converting stolen cash into cryptocurrency, and Athena relied on high-volume transactions—including fraud-driven transactions—to generate fee revenue;

d. Athena received "numerous reports of fraud per month" identifying impersonation scams as the "most common" activity at its ATMs, yet maintained systems that continued to facilitate such schemes and abandoned effective fraud prevention measures it had previously implemented;

e. The consistent, recurring pattern whereby fraudsters directed victims to Athena kiosks and Athena's systems reliably approved the transactions, creating a predictable and mutually beneficial operational framework;

f. Athena's operational choices aligned perfectly with what the fraudsters needed: while fraudsters kept victims on the phone directing large cash deposits using QR codes, Athena provided retail kiosk locations with immediate settlement, no holds or meaningful verification, and only passive warnings that could be easily bypassed under the fraudsters' direction; and

g. Athena's retention of substantial fees from transactions it knew or had reasonable cause to believe were fraud-driven, demonstrating financial benefit from facilitating the fraudsters' schemes.

219. This mutual understanding constituted a tacit meeting of the minds whereby criminal fraudsters would systematically direct victims to Athena's kiosks, and Athena would ensure those transactions proceeded without meaningful interference, with both parties deriving financial benefit.

220. Each Conspirator participated in the common design through their respective roles. The criminal fraudsters identified and targeted vulnerable older adults, deceived victims, maintained continuous phone supervision, and directed victims to Athena ATMs using fraudster-controlled QR codes. Athena provided the critical payment infrastructure, designed ATMs with immediate non-custodial settlement, maintained systems that approved high-risk transactions without adequate fraud prevention, extracted and retained substantial fees from fraud-driven transactions, and refused to implement safeguards that would have disrupted the fraudsters' operations despite actual knowledge of widespread ongoing fraud.

221. As a direct and proximate result of the Conspirators' malicious combination, Plaintiff and Class Members suffered actual injury to their property. Plaintiff Dulin lost approximately $4,500 in cash deposited into Athena's kiosk on June 26, 2025, pursuant to the coordinated scheme. Class Members suffered similar injuries, losing substantial sums through the coordinated scheme whereby criminal fraudsters directed victims to Athena kiosks and Athena's systems reliably processed the fraud-driven transactions without intervention while extracting and retaining fees.

222. The conspiracy claim is predicated upon viable, independent causes of action alleged in Counts One through Seven, including negligence, Ohio Products Liability Act violations, civil theft for receiving stolen property, conversion, unjust enrichment, and violations

of the Ohio Corrupt Practices Act. The conspiracy is the means by which the Conspirators accomplished these underlying unlawful acts.

223. The injury to Plaintiff and Class Members was accomplished in a way not competent for one person acting alone. The criminal fraudsters required a payment infrastructure that would accept large cash deposits from first-time older users and convert them immediately into effectively irreversible cryptocurrency transmissions. Traditional banking systems and reputable cryptocurrency exchanges have safeguards that would have prevented the fraudsters' schemes. The fraudsters specifically needed an operator like Athena that would process suspicious transactions without adequate verification, holds, or intervention.

224. Conversely, Athena could not have generated substantial fee revenue from fraud-driven transactions without the criminal fraudsters to orchestrate schemes, identify vulnerable victims, maintain coercive control during transactions, and provide scam narratives and QR codes resulting in victims depositing large sums. The coordinated combination of the fraudsters' deceptive schemes and Athena's facilitating infrastructure was necessary to accomplish the systematic harm.

225. The conspiracy also required the combination of the fraudsters' continuous phone control over victims and Athena's design choice to rely on passive warnings rather than active intervention. The fraudsters could coach victims through clicking past warnings only because Athena chose not to implement holds, live verification, or meaningful interdiction measures.

226. In a conspiracy, the acts of co-conspirators are attributable to each other. Athena is therefore liable for the full amount of damages caused by the unlawful acts committed by the criminal fraudsters in furtherance of the conspiracy.

227. Athena's conduct was willful, wanton, and malicious, as Athena acted with actual knowledge of substantial harm being inflicted on vulnerable older adults, consciously chose to maintain policies facilitating such harm for financial benefit, deliberately provided essential infrastructure enabling fraudsters' systematic victimization, and demonstrated reckless indifference to the rights and safety of Plaintiff and Class Members. By reason of this willful, wanton, and malicious conduct, Plaintiff and Class Members are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tammy L. Dulin, individually and on behalf of all members of the Class, prays for judgment against Defendant Athena Bitcoin, Inc., and respectfully requests the Court to enter an Order:

A. Certifying the proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

B. Declaring that Defendant's conduct violates the laws asserted herein, including, but not limited to, negligence, products liability, civil theft for receiving stolen property, conversion, unjust enrichment, violations of the Ohio Corrupt Practices Act, and civil conspiracy.

C. Awarding to Plaintiff and the Class all compensatory, consequential, and other damages allowed by law.

D. Awarding treble damages pursuant to the Ohio Corrupt Practices Act and any other applicable statute.

E. Awarding full restitution and disgorgement of all ill-gotten fees, profits, and revenue obtained by Defendant as a result of the wrongful conduct alleged herein.

F. Awarding pre- and post-judgment interest on all monetary awards.

G. Awarding forward-looking injunctive and equitable relief compelling Defendant to design, implement, and maintain effective, reasonable, and active fraud-prevention safeguards commensurate with the known and predictable risks of impersonation scams, including, but not limited to:

1. Reasonable transaction holds and reversal windows for suspected fraud.
2. Tiered limits and velocity controls calibrated to user risk.
3. Enhanced identity verification and destination wallet ownership checks.
4. Kiosk-level intervention protocols and enforced pauses for high-risk transactions with live support contact.
5. An effective escalation and remediation framework that prioritizes consumer protection, including the return of retained fees and funds from scam-driven transactions.

H. Awarding Plaintiff and the Class their reasonable attorneys' fees and costs of litigation.

I. Granting such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

*/s/ Brian D. Flick*

Brian D. Flick (0081605)
Marita I. Ramirez (0101882)
Marc E. Dann (0039425)
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Attorneys for Plaintiff Tammy Dulin and the putative class*

**JURY DEMAND**

Plaintiff Tammy Dulin hereby respectfully demands a trial by jury on all such claims that may be so tried.

Respectfully Submitted,

*/s/ Brian D. Flick*
Brian D. Flick (0081605)
Marita I. Ramirez (0101882)
Marc E. Dann (0039425)
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Attorneys for Plaintiff Tammy Dulin and the putative class*